[No. B053628. Second Dist., Div. Six. Jan. 29, 1992.]

In re the Marriage of WILLIAM M. and SUSAN J. CROOK.
WILLIAM M. CROOK, Appellant, v.
SUSAN J. CROOK, Respondent.

## Counsel

Richard I. Wideman for Appellant.

Robert A. McFarland for Respondent.

## Opinion

**YEGAN, J.**—Here we hold that unless a marital settlement agreement (MSA) contains an express unequivocal waiver, upon the employee spouse's eligibility to retire, the nonemployee spouse retains the right to receive his or her share of a community property pension. (*In re Marriage of Gillmore* (1981) 29 Cal.3d 418 [174 Cal.Rptr. 493, 629 P.2d 1].)

On June 30, 1987, the trial court entered judgment dissolving the marriage of William and Susan Crook. The judgment incorporated the MSA and specified that the trial court retained jurisdiction over the pension. William was not then eligible to retire.

The MSA provides, in pertinent part: "*At such time as Husband begins receiving retirement payments, Wife shall receive from each retirement payment*, that percentage of the payment allocable to her community interest calculated as follows: one-half of the product obtained by multiplying the amount of each retirement payment by the ratio of the months of Husband's employment with County of Santa Barbara, during marriage and prior to separation, which is 204 months, over the total number of months of Husband's employment with County of Santa Barbara. The Santa Barbara County Employees' Retirement Association has been joined as a party to this action. The court which enters the Judgment of Dissolution between them

will be asked to reserve jurisdiction to enforce Wife's right to receive such payments from Husband."[1] (Italics added.)

Given the language of the MSA, which we have italicized, William contends that he could unilaterally determine when Susan would start to receive her share of the community pension since only he could control receipt of "payment." Susan contends to the contrary.

William first became eligible to retire on December 1, 1989, and would have then received $1,531.56 per month had he retired. He elected not to do so. On June 1, 1990, Susan moved to commence receipt of her share of the pension retroactive to December 1, 1989, based upon *In re Marriage of Gillmore, supra,* 29 Cal.3d 418.

The trial court found that ". . . the *Gillmore* case did not involve interpretation of a marital settlement agreement. It is clear, however, that the *Gillmore* court felt strongly that the equities of the situation dictated that the nonemployee-spouse should not be deprived of her significant community property share of the employee-spouse's pension simply at the whim of the employee-spouse in deferring his retirement. Consequently, it seems reasonable that unless the marital settlement agreement on its face manifests a clear intention of the parties that the employee-spouse have full control over the date that payments to the nonemployee-spouse shall commence, the *Gillmore* rule should apply. The Court finds no such clear manifestation of intent in this case."

The trial court determined that William was first eligible for retirement benefits December 1, 1989, and ordered him to pay Susan $589.65 per month, as her share of the pension, retroactive from December 1, 1989. The $589.65 amount was apparently calculated utilizing 204 as the numerator and 266 as the denominator (length of service until Dec. 1, 1989, i.e., the date William was first eligible to retire).[2]

■ William argues that by executing the MSA, Susan made an irrevocable election to delay receipt of her share of the pension until he actually

---

[1] This MSA calculation refers to the "time rule." "According to the time rule the community interest is that fraction of the retirement benefits, the numerator of which represents the length of service during marriage and the denominator the total length of service by the employee-spouse. [Citation.]" (*In re Marriage of Henkle* (1987) 189 Cal.App.3d 97, 99, fn. 3 [234 Cal.Rptr. 351].)

[2] The fraction, 204/266, is the community interest in the pension as of December 1, 1989. 204/266, when expressed as a percentage is 76.69 percent. 76.69 percent of $1531.56 is $1174.55. One-half of $1174.55 is $587.27. We do not modify the $2.38 per month discrepancy since it is de minimis. "The law disregards trifles." (Civ. Code, § 3533.)

retires and receives pension "payments." He contends that Susan may not challenge the MSA now. We reject these claims.

As indicated, the trial court found that "unless the marital settlement agreement on its face manifests a clear intention of the parties that the employee-spouse have full control over the date payments to the nonemployee-spouse shall commence, the *Gillmore* rule should apply." We adopt the trial court's finding as our holding. This is consistent with the legislative command that "[t]he court shall make whatever orders are necessary or appropriate to assure that each party receive his or her full community property share in any retirement plan . . . ." (Civ. Code, § 4800.8.)

While the italicized language of the MSA is literally susceptible of the interpretaion advanced by William, there is no express agreement between Susan and William that he would have sole control over the timing of her receipt of her one-half of the community interest in the pension. That is to say, there was no express unequivocal waiver of "*Gillmore* rights."

We reject William's argument that the "time rule" 204-month numerator and the reference to his total employment as the denominator constitutes an express unequivocal waiver of "*Gillmore* rights." The theoretical denominator as set out in the MSA is consistent with Susan's understanding that William would retire at the earliest opportunity. The "time rule" specification is simply not sufficient proof that the parties agreed that William would have full control over the date payments would be made to Susan.

The declarations in support and in opposition to the motion are in sharp conflict. They were received into evidence without objection. Susan alleged that "[t]he whole last ten years of our marriage, at least, had been aimed at his retiring as soon as possible. . . ." By granting the motion, the trial court credited her declaration and the inference that flows therefrom: that the parties intended that William would retire as soon as possible with Susan receiving her pension interest at that time. The trial court did not credit William's contrary declaration that Susan always knew of his intention to work beyond first eligibility to retire.

Given the strong public policy favoring an equal division of community property (*In re Marriage of Gillmore, supra*, 29 Cal.3d at p. 428), the italicized language of an otherwise comprehensive 17-page MSA and reference to the "time rule" cannot reasonably be equated with an express unequivocal waiver of "*Gillmore* rights."

■ *Gillmore* recognized that "the timing of receipt and the control of an asset are important aspects of its value." (*In re Marriage of Gillmore, supra*,

29 Cal.3d at p. 424, fn. 4.) *Gillmore* explained that "to wait to receive his [or her] pension when it will be most profitable and most convenient for him [or her] deprives [the nonemployee spouse] of both the immediate enjoyment of her [or his] benefits and the power to manage them to her [or his] own advantage." (*Ibid.*)

Therefore, *Gillmore* states that "[t]rial courts can limit the employee spouse's freedom to choose [the way to exercise retirement plans] to the extent necessary to protect the interests of the nonemployee spouse." (*In re Marriage of Gillmore, supra,* 29 Cal.3d at p. 426, fn. 6.)

Were we to credit William's theory, he would have unilateral control of when Susan would receive her share of the pension. As the *Gillmore* court recognized, such postponement " '. . . is often the equivalent of complete defeat. Not only are the employee spouse's chances of dying on the job increasing with each passing year . . . , the present value of money is much more valuable as a person enters the last years of his [or her] life.' " (*In re Marriage of Gillmore, supra,* 29 Cal.3d at p. 424, fn. 4.)

■ The aforementioned policy considerations compel the conclusion that Susan did not waive her *Gillmore* rights by signing the MSA. Like any other property right in a dissolution action, *Gillmore* rights may be "bargained away" or waived as long as the intention to do so is express and unequivocal. However, the MSA on its face must manifest a clear intention of the parties that the employee spouse has full control over the date payments to the nonemployee spouse shall commence. Here, the showing is insufficient.[3]

■ As to the calculation of Susan's *Gillmore* rights, we reject William's contention that it should have been based on his pay at the time of separation. He theorizes that not to use the rate of pay at the time of separation gives Susan the benefit of his separate property efforts. We rejected a similar contention in *In re Marriage of Jacobson* (1984) 161 Cal.App.3d 465, 474-475 [207 Cal.Rptr. 512], and Division Three of the First Appellate District has squarely held that ". . . retirement benefits are not valued at the time of separation." (*In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 448 [181 Cal.Rptr. 910]; cf., *In re Marriage of Adams* (1976) 64 Cal.App.3d

---

[3]When drafting a *Gillmore* rights waiver, counsel might include an acknowledgment by the nonemployee spouse that the employee spouse may work past first eligibility to retire, has unilateral control over the date pension payments will be distributed to the nonemployee spouse, and is not required to pay the nonemployee spouse his or her equivalent share of the pension until actual retirement. The waiver might also recite the giving up of the right to receive pension payments or their equivalent until actual retirement is in consideration for other provisions of the MSA.

181, 185-189 [134 Cal.Rptr. 298].) "[T]he appropriate date of valuation of retirement or pension benefits is the date of trial or the date of payment of benefits. [Citations.]" (*In re Marriage of Marsden, supra,* 130 Cal.App.3d 448.) Where, as here, payments are ordered to commence upon first eligibility to receive a pension, they are to be based on the rate of pay at that time.

When the nonemployee spouse makes an election before the employee-spouse actually retires, it constitutes " '. . . an irrevocable election to give up increased payments in the future which might accrue due to increased age, longer service and a higher salary.' [Citations]." (*In re Marriage of Gillmore, supra,* 29 Cal.3d at p. 428, fn. 9.) However, the nonemployee spouse is entitled, ". . . to share in any increase in benefits which would have been received had [the employee spouse] actually retired on the date she [or he] elected to receive her [or his] interest, such as automatic cost-of-living adjustments." (*In re Marriage of Scott* (1984) 156 Cal.App.3d 251, 254-255 [202 Cal.Rptr. 716]; accord, *In re Marriage of Jacobson, supra,* 161 Cal.App.3d at p. 475.)

William misconstrues the requirement of the judgment that the Santa Barbara County Employees' Retirement Fund make pension payments directly to Susan when William actually retires. This provision is entirely proper. It does not entitle Susan to further appreciation due to future increases in salary or benefits to which she is not entitled. It merely makes the fund the direct payor of her share only when William actually retires. (See e.g., *In re Marriage of Jensen* (1991) 235 Cal.App.3d 1137, 1141 [286 Cal.Rptr. 911].) Meanwhile, William ". . . is required to reimburse her for her community share while he continues working." (*In re Marriage of Jacobson, supra,* 161 Cal.App.3d at p. 473, citing *In re Marriage of Gillmore, supra,* 29 Cal.3d at p. 427.)

The August 13, 1990, order requiring William to pay $589.65 per month as Susan's portion of the community interest in the pension is affirmed. Each side to bear its own costs and attorneys' fees on appeal.

Stone (S. J.), P. J., and Gilbert, J., concurred.

A petition for rehearing was denied on February 25, 1992, and the following opinion was then rendered:

YEGAN, J.—On petition for rehearing, William contends that he was first eligible to retire in 1987, and not in 1989 as found by the trial court. He claims that the monthly payment ordered should be based upon his rate of

pay in 1987 which would result in an approximate $200 per month reduction. William asks that we receive evidence on appeal and appends a copy of a letter from the Santa Barbara County Employees Retirement System to the effect that he was first eligible to retire on September 22, 1987.

Somewhere along the line, litigation must cease. ■ A reviewing court has discretion to grant or deny a motion to receive evidence on appeal. (Code Civ. Proc., § 909; *Monsan Homes, Inc.* v. *Pogrebneak* (1989) 210 Cal.App.3d 826, 830 [258 Cal.Rptr. 676].) The request is denied.

We also observe that even if William was first eligible to retire in 1987, the amount of payments would not decrease by approximately $200 per month as claimed.

Stone (S. J.), P. J., and Gilbert, J., concurred.

A petition for a rehearing was denied February 25, 1992.